O

JS-6

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

ESTATE OF DAVID MAURICE, JR.
AND STACEY MAURICE,

                    Plaintiff,

– v. –

LIFE INSURANCE COMPANY OF
NORTH AMERICA; SOUTHERN
CALIFORNIA EDISON COMPANY
EMPLOYEE BENEFIT PLAN; DOES
1 THROUGH 10, INCLUSIVE,

                    Defendant.

No. 5:16-CV-02610-CAS(SPx)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

      This matter was tried to the Court on December 6, 2017. Michael Horrow appeared for Stacey Maurice and the Estate of David Maurice, Jr. (collectively, "plaintiffs"), and Keiko Kojima appeared for defendant Life Insurance Company of North American ("LINA").

/ / /

/ / /

/ / /

/ / /

/ / /

# I.    FINDINGS OF FACT

## A.    David Maurice's Health History and Insurance Coverage

1.    David Maurice ("Maurice") was a long-term employee of Southern California Edison ("SCE").  He began working at SCE in November 1997.  AR 642.[1]

2.    Maurice, who was 41 at the time of his death in 2015, had been diagnosed with Type I diabetes in his twenties as a result of chemotherapy and a splenectomy to treat Hodgkin's lymphoma as a child.  AR 712-1406; 1050; 1052-1053; 1125; 2332.  Maurice's diabetes was uncontrolled.  AR 859; 1028; 1048; 1050; 1052-1053.

3.    Maurice's diabetes led to diabetic foot neuropathy, which is a common nerve disorder caused by diabetes that results in pain or loss of feeling in the toes or feet.  AR 2332; see Engstrand v. Colvin, 788 F.3d 655, 657 (7th Cir. 2015).

4.    Maurice dealt with a number of underlying medical conditions.  He had a history of Hodgkin's disease, Castleman's disease, rectal cancer, colon cancer, congestive heart failure, hypertension, obesity, renal failure, and aortic stenosis.  AR 1050; 1096; 381-392; 2327-2342.

5.    Because of his employment with SCE, Maurice was entitled to obtain a group Accidental Death and Disability ("AD&D") insurance policy from LINA.  Maurice was insured under two AD&D policies—the first policy provided basic coverage, AR 141 (the "Basic Policy"), and the second policy provided voluntary AD&D coverage, AR 13 (the "Voluntary Policy").

6.    Both AD&D policies provided a schedule of benefits for various covered losses.  In the event of a "Loss of One Hand or Foot," the Policies provided a benefit of "50% of the Principal Sum."  AR 13; 141.

///

7.    The Policies both define a Covered Accident as:

---

[1]    Citations to "AR" refer to the administrative record established in connection with the insurance claim process and admitted into evidence in this action by stipulation of the parties.

1

A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:

1. Occurs while the Covered Person is insured under this Policy;
2. Is not contributed to by disease, Sickness, mental or bodily infirmity;
3. Is not otherwise excluded under the terms of this Policy.

AR 15; 143.

8.    Both AD&D policies contain the following exclusion:

**COMMON EXCLUSIONS**

In addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss, which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the Description of Benefits section:

4. illness or disease.

AR 20; 148.

9.    The Policies further provide under the "Time Period for Loss" provision that "Any Covered Loss must occur within: 365 days of the Covered Accident." AR 13; 141.

10.    The Schedule of Benefits states the following with respect to the benefit amount:

**"Principal Sum, when referred to in this Schedule, means the Employee's Principal Sum in effect on the date of the Covered Accident causing the Covered Injury or Covered Loss unless otherwise specified."**

AR 13; 141 (emphasis in original).

11.    The AD&D policies pay 100 percent of the Principal Sum for loss of life and 50 percent for loss of one foot. AR 13; 141.

/ / /

/ / /

2

### B.    Maurice's 2015 Amputation and Insurance Claim

12.    On April 30, 2015, Maurice underwent a below-the-knee amputation on his left leg.  AR 500.  The amputation was necessary because a wound in Maurice's foot failed to heal.  AR 497.  This amputation is the loss for which Maurice sought benefits under the AD&D policies.

13.    On October 10, 2015, Maurice submitted a written claim for benefits, stating on the claim form that an unhealed wound necessitated the amputation, which was allegedly caused by an accident that occurred on May 22, 2008.  AR 642.  Maurice states on his claim form that "on 5/22/08 at approx. 8 pm while swimming in a hotel swimming pool I cut both feet on broken glass in the bottom of the pool."  AR 643.

14.    On the October 10, 2015 claim form, Maurice (1) provided a physician's statement from family practitioner Dr. Sunnyline Vendiola, who stated that the April 2015 amputation was the result of the May 2008 swimming pool injury, AR 646; and (2) identified the physicians and facilities where he received treatment for his injury.  LINA wrote to these providers to obtain the relevant medical records.  AR 644-45; 449; 446; 495; 559; 575.

### C.    Maurice's 2008 Injury and Ensuing Medical Treatment

15.    After allegedly cutting his feet on glass in a hotel swimming pool on May 22, 2008, Maurice sought treatment from Dr. Prem Salhotra.  However, LINA was unable to obtain medical records from Maurice's 2008 to early 2009 treatment with Dr. Salhotra, as Dr. Salhotra's office had purged these files by the time LINA reviewed Maurice's claim.  AR 644; 366.

16.    According to a history compiled by David and his wife, Stacey Maurice ("S. Maurice"), Maurice regularly saw Dr. Salhotra between May 2008 and June 2009 for "non-healing cuts to his feet."  When it appeared that the foot had become infected, Maurice was referred for an MRI.  AR 1667.

17.    An MRI was performed on September 16, 2009.  It revealed that Maurice had osteomyelitis, a rare and serious infection, in the bone of his left big toe.  AR 896.

Dr. Nalam treated Maurice for this infection and made an incision, inserted a drain, and started Maurice on antibiotics. Due to increased swelling and pain on Maurice's left foot, Maurice was soon admitted to the Desert Regional Medical Center ("Desert Regional"). AR 1125.

18.     At Desert Regional, Maurice saw Dr. Kama on October 9, 2009. Maurice reported that he had been experiencing foot ulcers for the past two years; Dr. Kama's notes do not reference the May 2008 glass accident. AR 1125. Dr. Kama administrated antibiotics intravenously, and referred Maurice to physical therapy for wound evaluation and care. AR 1127; 1129. The physical therapist reported that "[Maurice's] [left] great toe wound is beyond P.T. wound care scope of practice" and recommended referral to a surgeon. AR 1129.

19.     On November 5, 2009, Maurice consulted with Dr. Stabile, a surgeon, who stated that Maurice had an "open wound on the medial border of the IP [interphalangeal] joint of the foot." AR 1108.  In his consultation note, Dr. Stabile noted that "[d]iabetes has been hard, difficult to control because of infection. This started with a small blister from shoe wear and is progressed and continues to be difficult." Id. He opined that radiographs showed Maurice's interphalangeal joint was destroyed, and recommended amputation of the big toe on Maurice's left foot. AR 1008-98.

20.     The following day Maurice obtained a second opinion from Dr. James Bell, who "agree[d] with Dr. Stabile that amputation is the better course of treatment at this point in time." AR 1105. Dr. Stabile performed the amputation on November 10, 2009. AR 1119.

21.     Despite the amputation, Maurice's wound did not heal. On December 23, 2009, Dr. Stabile observed "new onset early necrosis" at the "distal tip of the second digit," and also observed swelling in the toe and nail, which "looks like it is starting to detach." AR 1090. A peripherally inserted central catheter ("PICC") line was inserted to allow antibiotics to be delivered to the infected location. AR 1020.

/ / /

22.     Over the course of 2010, Maurice met regularly with Dr. Russo for care and treatment of the wound and obtained assistance from nurses who provided him home health care.

23.     A microbiology report on July 5, 2010 showed the presence of streptococcus agalactiae and coryneform bacteria in Maurice's left foot.  AR 1818.  On July 13, 2010, Maurice purchased the antibiotic ZYVOX, and on July 30, 2010, he rented a "wound vac" to assist in treating the wound.  AR 1829; 1850.

24.     Maurice sought treatment from Dr. Salhotra on October 18, 2010 for the wound, and additional treatment from Dr. Kerkar on November 3, 2010.  AR 1868; 1870.  Despite this care, Maurice continued to have a worsening infection on his left foot.  AR 1031.

25.     In January 2011, Maurice was admitted to Desert Regional with swelling in his left foot.  AR 1023.  On January 11, 2011, Dr. Stabile observed that Maurice's left foot continued to be infected and that x-rays showed destruction of the "fifth metatarsal head and subluxed phalange on that side."  AR 1024.  On January 17, 2011, pathology identified gangrene in Maurice's left foot.  AR 1887.

26.     On January 13, 2011, Dr. Stabile performed a "transmetatarsal amputation" to halt the spread of the bone infection.  AR 1035.

27.     Maurice saw Dr. Stabile again on February 24, 2011.  Dr. Stabile observed that the wound needed cleaning, and that Maurice had a high risk of wound healing issues.  AR 1017.

28.     On March 1, 2011, Dr. Stabile performed another procedure on Maurice's left foot—he debrided the skin, subcutaneous tissue and bone, and applied a wound vac.  AR 1016.  Maurice continued to have home health for the wound care.  AR 1980; 1986.

29.     On April 30, 2011, Maurice went to the Desert Regional emergency room due to worsening redness, swelling, and deterioration of the wound on his left foot.  AR 988.  On June 29, 2011, Dr. Stabile opined that Maurice needed further debridement and skin grafting, and on August 2, 2011, Dr. Peter Jamieson performed a debridement and

5

"skin graft to the left foot wound." AR 961. Maurice followed up with regular care at Morongo Medical and with Dr. Russo, in addition to home nursing care.

30. During November 2012 through December 2013, Maurice had more extensive wound care from physicians and physical therapists at Desert Regional. During this period he regularly visited his primary care physician, Dr. Salhotra. AR 907.

31. On January 30, 2014, Dr. Jamieson conducted another skin graft to the wound. AR 904. On March 26, 2014, Dr. Jamieson concluded that the prior graft failed, and determined to try a thicker graft. AR 2237.

32. Dr. Jamieson met again with Maurice on May 16, 2014 and concluded that the new graft did not take. AR 2246. Dr. Jamieson recommended that Maurice try hyperbaric O2 treatment, of which Maurice completed 11 treatments by July 10, 2014. AR 1677.

33. On August 1, 2014, Maurice transferred to Eisenhower Medical Center for his wound care. AR 2259.

34. On August 28, 2014, Maurice met with Dr. Peterson at Eisenhower's wound care clinic. AR 2266. She observed that Maurice had difficulty walking due to his unhealed wound, was in great pain, and was taking narcotics. AR 2266; 2268; 2294; 2298.

35. In November 2014, Maurice learned that he had colon cancer and was admitted to Desert Regional. Maurice was diagnosed with Stage I colon cancer and underwent a bowel resection. AR 471.

36. On April 22, 2015, Maurice consulted with Dr. Yu, who determined that the bones of Maurice's left foot were infected. AR 497. Dr. Yu also noted that he had severe aortic stenosis and needed an aortic valve replacement, but that this replacement could not be done due to the infection. AR 497.

37. Dr. Yu determined that a below-the-knee amputation was required, and on April 30, 2015 he amputated Maurice's left foot and lower leg. AR 500.

/ / /

38.     On December 20, 2015, Maurice passed away at the age of 41.  AR 1666. The death certificate states that Maurice's immediate cause of death was ventricular fibrillation, with congestive heart failure and aortic stenosis identified as other leading causes of death, and with Castleman's disease, diabetes mellitus, and hypertension listed as significant conditions contributing to death.  AR 1666.

39.     S. Maurice proceeded with the AD&D claim as Maurice's wife and the Executrix of Maurice's estate.  AR 395.

**D.     Maurice's AD&D Claim and Appeals Process**

40.     On January 12, 2016, S. Maurice emailed LINA to inform it of Maurice's death, and to ask for an update on his claim.  AR 396.

41.     On January 27, 2016, LINA requested a "peer review" from a specialist in internal medicine, Dr. Mark Levin.  In a February 4, 2016 report, Dr. Levin provided a detailed history of Maurice's non-healing foot wound and the attempts by his physicians to address this problem, which led to amputation.  AR 263-72.  He concluded that the May 2008 injury, where Maurice allegedly cut his foot on glass, resulted in "multiple surgical interventions" and, eventually, the below-knee amputation.  AR 391.  Dr. Levin opined that Maurice's pre-existing diabetes was a contributing factor, and that "[t]he injury that occurred in 2009 would have[,] [to] a great extent of degree[,] [] contributed to the claimant's multiple surgical interventions and health issues."  AR 273.

42.     On February 24, 2016, LINA invited Dr. Levin to provide the evidence that supports the conclusion that Maurice suffered the claimed accidental cuts on his feet on May 22, 2008.  AR 369.  LINA also asked Dr. Levin whether the amputation "resulted directly and independently, (from accidental injury), of all other causes and was not significantly contributed to by sickness, disease or bodily infirmity."  AR 369.

43.     On February 26, 2016, Dr. Levin provided an addendum to his earlier report.  He opined that the evidence supporting the May 2008 injury was subjective, and that the claimant's "subjective report of the injury was obtained from submitted referral

/ / /

7

information." AR 374. Dr. Levin also concluded that diabetes was "a contributor to the claimant's" amputation. AR 375.

44.     On March 10, 2016, LINA denied Maurice's claim for AD&D benefits for three reasons: (1) LINA doubted the injury had ever occurred, AR 355; (2) LINA concluded that Maurice's various illnesses contributed to the loss of his leg, AR 355; and (3) based on policy language, the loss had to occur within 365 days of the 2008 accident, AR 355.

45.     S. Maurice appealed LINA's decision on August 24, 2016. AR 1407-1679.

46.     On appeal, S. Maurice addressed LINA's doubt regarding the May 2008 injury by providing nine declarations attesting to Maurice's statements as to the 2008 glass injury from (1) S. Maurice, AR 1434; (2) Robert Haines, a former co-worker, AR 1451-52; (3) Linda Ross, S. Maurice's mother, AR 1418-19; 1427; (4) Lance Larson, a former co-worker, AR 1453; (5) Jacob Ross, S. Maurice's brother, AR 1428-29; (6) Jason Ross, S. Maurice's brother, AR 1431; (7) Pat Ferror, a former co-worker, AR 1450; (8) Kevin Jakubczak, a close family friend, AR 1444-45; and (9) Nena McCullough, a former co-worker, AR 1448.

47.     S. Maurice also submitted an expert report by Dr. Jeffrey Galpin, who is board certified in internal medicine and infectious diseases. AR 2327. After reviewing the medical evidence and witness statements, Dr. Galpin opined that there is a "direct link beginning with the accident at the hotel, which became the center and focus of an acute and then chronic infection that led to losing his left lower leg." AR 2337. He opined that Maurice's diabetes was a contributing factor and that it made Maurice less likely to immediately recognize the severity of his cuts and hindered the wound's healing and Maurice's ability to fight infections. AR 2337-38. Dr. Galpin further opined that the injury initiated the process leading to the amputation, though he did not consider the role of foot ulcers, specifically, as part of his analysis. AR 2327-2342. Dr. Galpin also considered how diabetes generally affected Maurice's ability to recover from the alleged 2008 glass injury. AR 2338.

48. In response, LINA engaged Dr. Dorothy Low to re-review the file. AR 302. LINA asked Dr. Lowe to "review the medical and advise if Mr. Maurice's illness or diseases significantly contributed to the need for the 04/30/2015 amputation." AR 311. Dr. Lowe opined that Maurice's diabetes "significantly contributed to his need for left below knee amputation on 4/30/2015." AR 311. Dr. Lowe also questioned whether there was a May 2008 accident, and noted that statements by the patient, family members, and witnesses "do not qualify as direct medical evidence." AR 310.

49. On October 20, 2016, LINA upheld its denial of the claim. AR 280–290. LINA advised that a second, voluntary level of appeal was available. AR 290. Plaintiffs instead filed this lawsuit.

## II. CONCLUSIONS OF LAW

### A. *De Novo* Review Applies

1. The parties have stipulated to a *de novo* standard of review.

2. Under a *de novo* standard, the Court must determine whether benefits were correctly denied based on the evidence in the Administrative Record. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The Court reviews the claim by interpreting the governing plan documents without deferring to either party's interpretation. Id. at 112–13.

3. "[W]hen the court reviews a plan administrator's decision under the *de novo* standard of review, the burden of proof is placed on the claimant." Muniz v. Amec Construction Mgmt., Inc., 623 F.3d 1290, 1294 (9th Cir. 2010). Plaintiffs must demonstrate entitlement to policy benefits by a preponderance of the evidence. Armani v. Nw. Mut. Life Ins. Co., 840 F.3d 1159, 1163 (9th Cir. 2016); Wiley v. Cendant Corp. Short Term Disability Plan, No. 09-CV-00423-CRB, 2010 WL 309670, at *7 (N.D. Cal. Jan. 19, 2010).

### B. Applicable Legal Standards

4. The Ninth Circuit has held that ERISA preempts state common-law rules related to interpretation of employee benefit plans. Dowdy v. Metro. Life Ins. Co., No.

16-15824, 2018 WL 2223722, at *4 (9th Cir. May 16, 2018); <u>McClure v. Life Ins. Co. of N. Am.</u>, 84 F.3d 1129, 1133 (9th Cir. 1996) (citing 29 U.S.C. § 1144(a); <u>Evans v. Safeco Life Ins. Co</u>, 916 F.2d 1437, 1439 (9th Cir. 1990)).  While ERISA's "savings" clause exempts from preemption "any law of any state which regulates insurance," 29 U.S.C. § 1144(b)(2)(A), "state laws of insurance policy interpretation do not qualify for the saving clause exception and are preempted." <u>Id.</u> (citing <u>Evans</u>, 916 F.2d at 1440).  Instead, "the interpretation of ERISA insurance policies is governed by a uniform federal common law." <u>Id.</u> at 1439.

5.    The Ninth Circuit in <u>McClure</u> considered policies that contained substantially identical policy language to the language provided in the AD&D policies at issue here.  Like Maurice's policies, the policies in <u>McClure</u> ensured "against loss resulting *directly and independently* of all other causes from bodily injuries caused by accident." <u>McClure</u>, 84 F.3d at 1132 (emphasis added); <u>see</u> AR 15; 143.  The Ninth Circuit noted that other federal circuits, such as the Fourth Circuit, refused to enforce this "directly and independently" language on public policy grounds, given that this language—interpreted literally—would "nullify the benefits an insured could expect from a policy in a large number of instances." <u>Id.</u> at 1135.  The Court of Appeals held that insofar as policy language such as this is conspicuous to the insured, recovery of benefits under the policy is barred if a preexisting condition "substantially contributed" to the disability, and that state law rules of interpretation providing for a broader coverage were preempted.[2] <u>Id.</u> at 1136; <u>see</u> <u>Dowdy</u>, 2018 WL 2223722, at *4.

6.    For a pre-existing condition to be considered a "substantial" contributing factor for the purpose of restricting coverage to "direct and sole causes" of the injury, the pre-existing condition "must be more than merely *a* contributing factor," and that a relationship of "undetermined degree is not enough." <u>Dowdy</u>, 2018 WL 2223722, at *5

---

[2]    Plaintiffs agree that the language contained in the AD&D policies at issue here is sufficiently conspicuous.  Dkt. 48 at 4, n.1.

(quoting <u>Adkins v. Reliance Standard Life Ins. Co.</u>, 917 F.2d 794 (4th Cir. 1990)) (emphasis added). In <u>Dowdy</u>, the Ninth Circuit—citing to the Restatement (Second) of Torts—observed that a "substantial cause" denotes the "idea of responsibility." <u>Id.</u> To ascertain a substantial cause,

> [T]here must be some evidence of a significant magnitude of causation. Such evidence need not be presented with mathematical precision, but must nonetheless demonstrate that a causal or contributing factor was more than merely related to the injury, and was instead a substantial catalyst.

<u>Id.</u> Consistent with federal common law construing coverage provisions in a manner that does not unreasonably limit coverage, the Policies will afford coverage to plaintiffs unless Maurice's pre-existing diabetes "substantially contributed" to his 2015 amputation. <u>See id.</u> at *6.

## C. Discussion

7. According to LINA's AD&D policy language, the Policies provide benefits for covered losses that are "the result, directly and independently of all other causes, of a Covered Accident." AR 15; 143. As stated *supra*, a "Covered Accident" is defined in both policies as "[a] sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:

1. occurs while the Covered Person is insured under this Policy;
2. is not contributed to by disease, Sickness, mental or bodily infirmity;
3. is not otherwise excluded under the terms of the Policy."

AR 15; 143. As noted, LINA and plaintiffs agree that this policy language is conspicuous.

8. Using the Ninth Circuit's substantial cause test, the Court must look to the administrative record to determine whether Maurice's diabetes was a substantial contributing factor of his 2015 amputation. <u>See Dowdy</u>, 2018 WL 2223722, at *5. In

11

light of a disagreement between the parties as to the sufficiency of evidence supporting the occurrence of the alleged 2008 swimming pool accident, the Court must first determine whether a preponderance of the record evidence demonstrates that the 2008 swimming pool accident occurred.

9.     The Ninth Circuit has noted that, in conducting a *de novo* review of a plan administrator's decision to deny benefits, a court may consider evidence normally inadmissible under the strict rules governing admissibility of evidence in a civil trial, as long as that evidence is "relevant, probative, and bears a satisfactory indicia of reliability." Tremain v. Bell Industries, Inc., 196 F.3d 970, 978–79 (9th Cir. 1999) (citing Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan, 46 F.3d 938, 941, 943 n.2); see Grosz-Salomon v. Paul Revere Life Ins. Co., No. 98-CV-7020-DDP-RNBX, 1999 WL 33244979, at *4 (C.D. Cal. Feb. 4, 1999), aff'd, 237 F.3d 1154 (9th Cir. 2001) ("The Court must review the entire administrative record in these cases …. The plan administrator, however, is not bound by the Federal Rules of Evidence. The Court does not believe that it would be proper to exclude materials upon which the administrator relied because these materials as presented to the Court might not be admissible at trial without further documentation or verification.").

10.     Here, LINA indicated in its denial of plaintiffs' appeal that it reviewed the nine declarations that S. Maurice submitted, which attested to the occurrence of Maurice's 2008 swimming pool accident. AR 0282. Having reviewed these declarations, the Court concludes that they satisfy the requirements set forth in Tremain. The declarations are relevant and probative insofar as they attest to the occurrence of the 2008 accident, and the declarations appear reliable insofar as they were averred under penalty of perjury and insofar as nothing in the record suggests these declarations to be otherwise unreliable. AR 1425; 1430; 1432; 1443; 1447; 1449; 1450; 1452; 1454. Moreover, because these declarations constitute part of the administrative record—given that LINA reviewed them as part of plaintiff's appeal—the Court is obligated to review them as part of its *de novo* review of the record. See Silver v. Exec. Car Leasing Long-

Term Disability Plan, 466 F.3d 727, 733 (9th Cir. 2006) (observing that when district courts conduct *de novo* review, they have a responsibility under the ERISA framework to undertake an independent and thorough inspection of an administrator's decision).

11.   As LINA points out, there are no contemporaneous medical records documenting the alleged broken glass incident and resulting cuts to Maurice's feet. His physician at the time of his 2008-2009 treatment, Dr. Salhotra, had purged Maurice's 2008 and early 2009 medical records by the time LINA requested these records in 2016. Available medical records from October 2009 demonstrate that Dr. Kama noted Maurice reported "ulcers on his lower extremities related to his diabetes for approximately the past 2 years and [he] has been seeing podiatry. Approximately 2 months ago, he noticed that he had [an] ulcer on the lateral aspect of his big toe on the outer aspect." AR 1125. November 2009 notes from Dr. Stabile also reflect that an "infection started with a small blister from shoe wear." AR 1108.

12.   However, despite the lack of contemporaneous medical records, record evidence does exist that supports the occurrence of the 2008 swimming pool accident. Along with Maurice's claim for benefits in 2015, Dr. Vendiola submitted a statement that Maurice's injury occurred "swimming in [a] hotel pool and cut both foot on glass in pool." AR 0646. In addition, as noted, S. Maurice submitted nine declarations on appeal—all of which provide accounts of various individuals' knowledge of the swimming pool accident. Linda Ross, S. Maurice's mother, attests that after she met Maurice in 2008, she immediately noticed he was limping; after she had known Maurice for a few weeks, he explained that he cut his feet in a swimming pool during a training event for his job with SCE and that the cuts had still not healed. AR 1418. S. Maurice and her two brothers similarly attest to Maurice's limp and explanation about the swimming pool accident. AR 1430; 1432; 1443. Nena McCullough, Maurice's coworker at SCE, attests that after he returned from SCE training, Maurice told her about the swimming pool accident, and thereafter she and another coworker, Robert Haines, urged him to report his injuries to his supervisor and file a worker's compensation claim.

13

AR 1448.  McCullough testifies that Maurice became upset at the idea of reporting, as he was worried about keeping his job because he was no longer a union member.  Id. Haines echoes McCullough's remarks and attests that after Maurice returned from training, he told Haines that he had cut his feet on broken glass in the swimming pool.  AR 1451.  Haines urged him to make a worker's compensation claim.  Id.  Likewise, Pat Ferro testifies that he met Maurice as a firefighter for the California Department of Forestry, and that when he heard Maurice was in the hospital in 2015, he went to visit him.  AR 1450.  During Ferro's visit, Maurice told him that the loss of his leg stemmed from an injury to his feet when he cut them on broken glass in a swimming pool.  Id. Lance Larson also went with Ferro to visit Maurice in 2015, and submitted a declaration attesting to Maurice's assertion that the loss of his leg stemmed from an injury to his feet when he accidentally cut them on broken glass.  AR 1453.

       13.     LINA contends that plaintiff cannot establish that Maurice's amputation occurred due to the broken glass injuries as opposed to his naturally-occurring foot ulcers, and argues that the medical records contain the best evidence to corroborate or invalidate the existence of the 2008 swimming pool accident.  Though Dr. Stabile's notes reflect that Maurice had an ulcer on his foot stemming from shoe wear, Dr. Kama's notes reflect the presence of ulcers for approximately two years prior—a finding not inconsistent with the prior glass lacerations and resulting injury and infections. Moreover, the nine separate declarations, submitted under the penalty of perjury, further support the likelihood that Maurice suffered lacerations to his feet, which never healed, as a result of stepping on broken glass in a swimming pool in 2008.   In addition, neither Dr. Lowe nor Dr. Levin, LINA's experts, opine that diabetes-related ulcers were instead responsible for the eventual amputation.  AR 310–312; AR 0391–92.  Dr. Lowe opines that no *direct* medical evidence supports the existence of the 2008 wounds, and that Maurice's "uncontrolled diabetes mellitus significantly contributed to his need for left below knee amputation," although she does not specifically opine as to the cause of Maurice's left foot injuries.  AR 311.  Instead, Dr. Lowe discusses how Maurice's

diabetes may have caused him not to feel "an injury to his feet until he developed an infection." AR 311–312. In Dr. Levin's initial report for LINA, he appears to assume that the 2008 wounds occurred by opining that "[t]he injury that occurred in 2008 would have[,] [to] a great extent of degree[,] [] contributed to claimant's multiple surgical interventions and health issues," and also that "the claimant's wounds are directly related to both the injury to his feet and his poorly controlled diabetes." AR 0391. In his second report, and in response to LINA's question as to whether evidence supporting the 2008 injuries is objective or subjective in nature, Dr. Levin opines that the evidence is subjective. AR 374.

14. Dr. Galpin, plaintiffs' expert, also assumes that the 2008 wounds occurred, even while separately acknowledging the existence of ulcers when Maurice was admitted to the hospital on October 8, 2009, noting that he "had developed swelling of his left great toe different than his chronic pain and swelling had been," and that, in 2014, Maurice had a "diabetic ulcer to the left foot." AR 2334; 2335. Dr. Galpin goes on to conclude that the 2008 lacerations from the glass were "more than enough to light the wick that eventually cost him his [below knee] amputation," and that the 2008 lacerations were "more likely than not, the cause of [Maurice's] left below-the-knee amputation." AR 2341–2342. Dr. Galpin also opines that the injuries to Maurice's right foot "did heal, and that did well with the declaration and descriptions that the left foot had the far more severe glass injury initially." AR 2329. Significantly, none of the parties' experts opine that there is any evidence that Maurice suffered from ulcers *before* the 2008 swimming pool accident. Accordingly, although it appears that no "direct" medical evidence exists—in the form of contemporaneous doctor's notes—to verify the 2008 accident, the Court finds that the physician's statement from Dr. Vendiola, the nine declarations from Maurice's various family, friends, and coworkers, and the expert reports demonstrate that it is more likely than not that the 2008 swimming pool accident occurred.

///

15

15.     Because the Court finds that plaintiffs satisfy their burden of demonstrating that it is more likely than not that the 2008 accident occurred, the Court next addresses whether Maurice's pre-existing condition was the substantial contributing factor leading to his 2015 amputation.  In <u>Dowdy</u>—a similar case concerning a below-the-knee amputation of an insured's left leg, where the appellant-insured was diabetic and developed osteomyelitis after sustaining injuries to his left leg in a car accident—the Court of Appeals observed that the record did not demonstrate that diabetes was a substantial contributing factor insofar as the experts failed to elaborate on "how much of a role that [diabetes] played in [appellant's] failure to recover," and because one expert faulted "both 'comorbidities' and the 'type of injury'" as the grounds for amputation. <u>Dowdy</u>, 2018 WL 2223722, at *6.  The record evidence demonstrated that the appellant's "diabetes was a complicating factor," but the court observed that it was "not identified as a substantial contributor to the ultimate loss."  <u>Id.</u>

16.     Here, Dr. Levin's first report indicates that "the claimant's wounds are directly related to both the injury to his feet and his poorly controlled diabetes mellitus," that the 2008 injury "would have [to] a great extent of degree [] contributed to the claimant's multiple surgical interventions and health issues," and that Maurice's "glucose levels were not well controlled leading to multiple skin ulcerations, infections, and surgical interventions to include amputations."  AR 391.  Shortly after this initial report, LINA asked Dr. Levin to "further expand" and explain whether the amputation "was not significantly contributed to by sickness, disease or bodily infirmity."  AR 374.  In response, Dr. Levin simply opines that Maurice's "diabetes mellitus was *a contributor* to [Maurice's amputation]," and did not opine that the diabetes was a *significant* or *substantial* contributor to the amputation.  AR 375 (emphasis added).  Additionally, Dr. Galpin, plaintiffs' expert, opines that "[t]he glass lacerations started a tunnel that could not be closed through traversing his damaged skin barrier.  With this alone in a diabetic with small vessel disease and neuropathy, that was more than enough to light the wick that eventually cost him his [below knee] amputation …."  AR 2341.  Dr. Galpin further

16

opines that the accidental cuts were "more likely than not, the cause of his left below-the-knee amputation." AR 2342.

17.    Unlike Dr. Levin and Dr. Galpin, Dr. Lowe—LINA's expert retained for the appeal of LINA's denial—opines that Maurice's "uncontrolled diabetes mellitus significantly contributed to the need for the … amputation." AR 311. Dr. Lowe notes that, insofar as the 2008 injuries occurred, "a foot wound from broken glass may be very painful, may even become infected and require antibiotics, and may require specific wound care for healing … [h]owever, in an individual who does not have uncontrolled diabetes, such a wound would be very unlikely to result in an amputation." AR 312. Dr. Lowe further opines that Maurice's diabetes and "diabetic neuropathy played key roles in his inability to heal properly from his wounds, his difficulty overcoming his foot infections, his recurrent lower extremity infections, and ultimately his left below knee amputation on 4/30/2015." Id.

18.    Upon review of the record, and in particular, the above-described expert reports, the Court concludes that the record does not demonstrate that Maurice's diabetes was a substantial contributing factor in his 2015 amputation. Though Dr. Lowe opines that Maurice's diabetes "significantly contributed" to the amputation, the two other experts—Dr. Levin and Dr. Galpin—do not reach this conclusion. To the contrary, in response to LINA's unequivocal question as to whether Maurice's amputation was "significantly contributed to" by sickness or disease, Dr. Levin, LINA's own expert, simply opines that the amputation "did not result directly or independently from his accidental injury. The claimant's diabetes mellitus was a contributor to the claimant's [amputation]." AR 375. Moreover, Dr. Galpin opines that the 2008 injuries were "in fact, [a] relatively high probability more likely than not, the cause of his below-the-knee amputation on April 30, 2015." AR 2342. Given these contradictory reports as to the level of contribution of Maurice's diabetes to the 2015 amputation, and because Dr. Levin and Dr. Galpin opine that the diabetes was merely a contributing factor in the

///

17

amputation, the Court concludes that the record does not demonstrate that Maurice's diabetes was a substantial contributing factor in his amputation.[3]

19. Given the Court's conclusion that Maurice's diabetes did not substantially contribute to his amputation, the next determination is whether the period between the 2008 accident and the 2015 amputation bars coverage under Maurice's AD&D policies. The Policies require that the "Covered Loss" occur within 365 days of the "Covered Accident." AR 13. Under California's "process of nature rule," time limitations such as these may disregarded if the insured can show that the ultimate loss was part of the natural disease process begun by the accidental injury.[4] The process of nature rule provides that

> Within the meaning of policy provisions requiring disability within a specified time after the accident, the onset of disability relates back to the time of the accident itself whenever the disability arises directly from the accident within such time as the process of nature consumes in bringing the person affected to a state of total disability.

---

[3] The Court notes that the Policies also contain an exclusion for losses that are "contributed to by disease, [s]ickness, mental or bodily infirmity." As the Ninth Circuit has observed, exclusions are construed narrowly under general principles of insurance law, and the "substantial contribution standard applies in interpreting the concepts of cause and contribution in [an illness or infirmity] exclusion." See Dowdy, 2018 WL 2223722, at *6. For the same reasons articulated *supra*, the Court concludes that the record fails to demonstrate that diabetes substantially contributed to Maurice's 2015 loss. Accordingly, the record evidence is insufficient to show that the Policies' illness exclusions apply to Maurice's 2015 amputation.

[4] California's process of nature rule satisfies the two-part test set forth in Kentucky Association of Health Plans, Inc. v. Miller, 538 U.S. 329, 34 –42 (2003), which requires that for a state law to be covered by ERISA's savings clause, it must (1) be specifically directed toward entities engaged in insurance; and (2) substantially affect the risk pooling arrangement between the insurer and the insured. See Anderson v. Continental Casualty Co., 258 F. Supp. 2d 1127 at 1131–32 (reasoning that the process of nature rule is specifically directed toward the insurance industry and substantially affects the risk pooling arrangement between the insurer and the insured, and concluding that the rule is therefore saved from preemption by ERISA's savings clause).

Nat'l Life & Accident Ins. Co. v. Edwards, 119 Cal. App. 3d 326 (1981); Willden v. Washington Nat. Ins. Co., 18 Cal.3d 631, 634 (1976).  This rule was created to address arbitrary limitations on coverage.  See Willden, 18 Cal.3d 631 at 635.

20.     LINA argues that the process of nature rule does not apply because Maurice's loss can be explained by other naturally-occurring events common to diabetics.  Yet, to the contrary, both Dr. Levin and Dr. Galpin, as noted *supra*, agree that the May 2008 injury *resulted* in the April 2015 amputation.  AR 0391; 2341.  Dr. Galpin further opines that there is a "direct link beginning with the accident at the hotel, which became the center and focus of an acute and then chronic infection that led to losing his left lower leg." AR 2337.  He also notes that the time interval between the 2008 accident and the "amount of damage that occurred…fits well within what chronic osteomyelitis does and even fits better in what somebody with diabetes, Castleman's disease, Hodgkin's, radiation, chemotherapy, splenectomy, would be expected to do." AR 2341.  And, as noted, Dr. Levin opines that "[t]he injury that occurred in 2008 would have a great extent of degree [] contributed to the claimant's multiple surgical interventions and health issues." AR 391.  Moreover, the record supports the conclusion that the 2008 injury resulted in the 2015 amputation: Maurice regularly saw Dr. Salhotra between May 2008 and June 2009 for the non-healing cuts to his feet; Maurice's left big toe was amputated in November 2009; over the course of 2010, Maurice's infection continued to worsen; during 2011, Maurice underwent a "transmetatarsal amputation" on his left foot and numerous debridement procedures; during 2012, Maurice had extensive wound care; during 2013 through 2014, Maurice underwent further debridement procedures and wound care; and in 2015, Maurice's left foot and lower leg were eventually amputated.  Accordingly, upon review of the record and the expert reports, the Court finds that Maurice's 2015 amputation relates back to the time of the 2008 swimming pool accident insofar as the accident set into motion—and is directly related to—the later amputation.

21.     The final dispute between the parties concerns the amount of benefits payable under the Voluntary and Basic AD&D policies.  The parties agree that, under

the schedule set forth in the Policies, the benefits for a "Loss of One … Foot" are 50 percent of the Principal Sum.  AR 13; 141.  Moreover, the Policies provide that the "Principal Sum, whenever referred to in this Schedule, means the Employee's Principal Sum in effect on the date of the Covered Accident causing the Covered Injury or Covered Loss unless otherwise specified."  AR 13.  Plaintiffs argue that benefits should be paid according to the amount of coverage in effect in 2015, the date of Maurice's amputation.  LINA contends that the coverage in effect in 2008, the date of the swimming pool accident, should instead apply.

22.    Courts "interpret terms in ERISA insurance policies in an ordinary and popular sense as would a [person] of average intelligence and experience." Evans, 916 F.2d at 1441.  Thus, invoking an ordinary reading of the "Principal Sum" provision, the Court finds that the amount of coverage is the coverage "in effect on the date of the Covered Accident."  The date of the covered accident is May 22, 2008.  The parties do not dispute that, if 2008 is the applicable coverage date, the Voluntary Policy coverage is $172,000, Basic Policy coverage is $30,000, and the total coverage is therefore $202,000.  Because the "Loss of One … Foot" is 50 percent of the Principal Sum, the total benefit here is $101,000.

23.    As such, the Court finds that Maurice's below-knee amputation of his left leg is a covered loss under LINA's Voluntary and Basic AD&D policies in the sum of $101,000.

24.    Any conclusion of law that is deemed to be a finding of fact is hereby adopted as a finding of fact, and any finding of fact that is deemed to be a conclusion of law is adopted as a conclusion of law.

Dated:  June 4, 2018

_Christina A. Snyder_
_____
Christina A. Snyder
UNITED STATES DISTRICT JUDGE